IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-cv-253

| | |
|---|---|
| Jeffery A. Smiley,<br><br>Plaintiff,<br><br>v.<br><br>Ensystex II, Inc.,<br><br>Defendant. | **COMPLAINT<br>AND JURY DEMAND** |

Plaintiff Jeffery A. Smiley, through his counsel, the law firm of Williams & Ray, PLLC, for his Complaint against Ensystex II, Inc. alleges the following:

## I.     NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964 ("Title VII") to correct unlawful employment practices based on race (African American) and to provide appropriate relief to Jeffery A. Smiley ("Plaintiff" or "Mr. Smiley"), who was adversely affected by the unlawful employment practices. Specifically, Plaintiff alleges that Ensystex II, Inc. ("Defendant" or "Ensystex") terminated his employment based on his race (African American).

## II.     JURISDICTION AND VENUE

1.     The court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as Plaintiff Smiley is alleging violations of his rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e).

2. Venue is proper, pursuant to 28 U.S.C. § 1391, as the employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Eastern District of North Carolina.

3. Plaintiff Smiley has complied with all administrative, jurisdictional, and legal prerequisites for the filing of this action. Specifically, Mr. Smiley filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging, *inter alia*, discrimination based on his race. The EEOC issued Mr. Smiley with a notice granting him the right to sue Ensystex on March 12, 2021.

### III. PARTIES

4. Plaintiff, Smiley, is a citizen and resident of Harnett County, North Carolina.

5. At all relevant times, Defendant Ensystex II, Inc. was an employer engaging in an industry affecting commerce; employs more than fifteen employees; and has continuously been doing business in the Fayetteville, North Carolina. Defendant's Principal and Registered office is located at 202 Fairway Drive, Fayetteville, NC 28305. Defendant can be served by serving process on David R. Nimocks IV, at the registered office.

### IV. FACTUAL BACKGROUND

#### A. Facts Related to Defendant's Business Structure

6. Ensystex is a company that manufactures and supplies pest control products.

7. Defendant's operation consists of various buildings. Specifically, it has a Corporate Office, a Bait Shop, a Woodshop, a Production Warehouse, and a Storage Warehouse.

8. The Corporate Office houses various administrative employees, a supervisor, and the executive team.

9. The Bait Shop is a building where chemicals are used to manufacture Defendant's bait-related pest control products. At this facility, there are approximately five production workers, a driver, and a supervisor.

10. The Woodshop is a building where Defendant manufactures its lumber-related pest control products. At that facility, there are approximately four production workers and a supervisor.

11. The Production Warehouse is a building where Defendant manufactures its liquid pest control products. At that facility, there are two supervisors and approximately six production workers (plus temporary employees).

12. The Storage Warehouse is a building where all of Defendant's product are stored after production and before being shipped out to its customers. This facility consists of one supervisor, one assistant supervisor, and one worker.

13. In addition, Defendant employed a driver (known as the "head driver") who would be responsible for transporting product and supplies to and from the various facilities. On occasion, the driver would make direct deliveries of Defendant's products to its local customers.

### B. Plaintiff is Hired

14. Plaintiff is an African American male.

15. In April 2010, Ensystex hired Plaintiff as a Production Material Handler/Driver. In that role, Plaintiff's job responsibilities consisted of mixing chemicals to produce Defendant's bait related products, packaging and palletizing the finished product, and preparing finished product for shipment. In addition, Plaintiff was the "relief driver" and would undertake the head driver's responsibilities in his absence. Over time, Plaintiff was also designated as the trainer for new employees on many aspects of the job, including, forklift operations.

16. At the time he was hired, the Bait Shop was supervised by Ray Nimocks (Caucasian male), who is part owner of the company. Later, that role was assumed by Tyler Nimocks (Caucasian male), who is also part owner of the company and the brother of Ray Nimocks.

17. At the time Plaintiff was hired, the head driver position was held by Dwayne Capage (Caucasian male). Ensystex provided Mr. Capage, as the head driver, a company email address, a company cell phone, and with full autonomy to plan the runs and deliveries as he saw fit.

18. Plaintiff thrived in his role. In fact, during his tenure, he received a quarterly bonus every quarter, an annual bonus every year, and a raise in his hourly rate of pay on every occasion that Defendant was providing raises to its hourly workers. This compensation was not provided to everyone; it was only provided to employees who were performing adequately, and many employees did not receive such compensation.

19. Moreover, during his entire tenure, Plaintiff never received any formal disciple or reprimands. Additionally, other than the event that allegedly gave rise to his termination, Plaintiff did not have a single accident while driving at work, with either the delivery truck or the forklift that is driven inside the facility.

20. Between the time he was hired and 2016, Plaintiff availed himself to two federal workplace protections. First, Defendant granted Plaintiff a religious accommodation that permitted him to not work on Saturday. Plaintiff is a practicing Seven-Day Adventist which observes Saturday as the day of the Sabbath.

21. Second, Plaintiff was granted an accommodation for his disability in the form of intermittent leave under the Family Medical Leave Act ("FMLA"). Plaintiff suffers from type 2 diabetes which requires insulin and testosterone shots to be administered approximately every other week.

### C. Plaintiff is Not Considered for a Promotion, and New Supervisor Immediately Begins Discriminating Against Him

22. Around approximately the end of 2016, Tyler Nimocks stepped away from the supervisor role at the Bait Shop creating an opening in the position.

23. Around that time, Plaintiff spoke directly to Ray Nimocks to express his interest in the supervisor position and his desire to be considered for the job. Mr. Nimocks acknowledged Plaintiff's request and agreed to consider him for the position.

24. However, instead of formally posting the position or even interviewing Plaintiff for the position, Defendant hired Sam Kosko (Caucasian).

25. Mr. Kosko was less qualified for the position than Plaintiff. Specifically, Mr. Kosko had no experience in the pest control industry and no experience working in a facility that mixed chemicals to produce products. In fact, Plaintiff was called upon to train Mr. Kosko.

26. Almost immediately after Mr. Kosko was hired, he began discriminating against Plaintiff.

27. Within the first few months of his employment, Mr. Kosko observed Plaintiff taking brief leave to attend his doctor's appointments, and as a consequence, Mr. Kosko demanded that Plaintiff submit additional paperwork to maintain his FMLA leave. At the time Plaintiff availed himself to this leave prior to Mr. Kosko's hiring, Plaintiff followed all the directions from Human Resources ("HR") to obtain his accommodation and did so with full knowledge by the company owners. At no time did Plaintiff face unfair questioning or scrutinization for additional documentation until Mr. Kosko became his supervisor. Indeed, Mr. Kosko's demand was not prompted by Human Resources ("HR").

28. Plaintiff complied with the directive and resubmitted paperwork to HR. HR maintained his accommodation.

29. Toward the end of 2018, again unprompted by HR, Mr. Kosko again demanded that Plaintiff submit paperwork to maintain his accommodation. To this request, Plaintiff asked why it was necessary given that he had already done that on two different occasions. Mr. Kosko's response was "because I told you to." Being a dutiful employee, Plaintiff again scheduled a doctor's appointment to reobtain the requested paperwork.

30. Then in 2019, Mr. Kosko attempted to remove Plaintiff's religious accommodation. In this instance, despite the accommodation being on record and in place for nine years, Mr. Kosko demanded that Plaintiff begin working on Saturday. Plaintiff objected and cited to his religion. Mr. Kosko was undeterred and stated that if Plaintiff did not come into work on Saturday, he would be terminated.

31. Fortunately, Plaintiff was able to appeal to Ray Nimocks who overruled Mr. Kosko's decision and permitted Plaintiff to maintain his accommodation.

### D. The Discrimination Continues in Plaintiff's New Role

32. In December 2019, the head driver, Dwayne Capage, moved into a supervisory position elsewhere in the company leaving that position open. Because Plaintiff was the only other driver in the company, he was moved into the open role. However, Plaintiff was treated starkly different than Mr. Capage.

33. Specifically, Mr. Kosko refused to acknowledge Plaintiff as the head driver and did not in fact change his title to the same. Moreover, Plaintiff was neither provided a company email address, nor was he provided with a company cell phone. Additionally, Plaintiff was not given full autonomy to plan the runs and deliveries as he saw fit; rather, Mr. Kosko dictated the schedule to Plaintiff. Finally, and perhaps most importantly, Plaintiff was not given a pay raise and in fact was paid considerably less than Mr. Capage did while in that position.

34. Another significant difference in treatment between Plaintiff and Mr. Capage was the leniency afforded as it related to "random" drug tests. In this regard, after Mr. Kosko was hired, he instituted a program by which the two drivers (Plaintiff and Mr. Capage) would be subjected to "random" drug tests. These test came in addition to the annual required physicals which also included a drug screening.

35. Over the course of four years in which Plaintiff worked under Mr. Kosko, Plaintiff was subjected to at least three "random" drug tests in which he was directed to immediately submit to the screening. Conversely, during that same time, Mr. Capage was subjected to a single "random" drug test and was able to schedule the appointment at his convenience.

### E. Plaintiff is Terminated for Pretextual Reasons

36. On May 12, 2020, while driving a forklift with a load of pallets, Plaintiff inadvertently clipped a piece of loose metal hanging off the Bait Shop building causing an accident.

37. The accident was minor and the first time in over ten years that Plaintiff had a work-related accident.

38. Plaintiff immediately reported the accident to Mr. Kosko who seized this opportunity to terminate Plaintiff's employment.

39. Mr. Kosko instructed Plaintiff to leave work and immediately submit himself to a urinalysis to screen for drugs or alcohol in his system.

40. The request was strange for a few reasons. First, this was the first time in his tenure that he observed anyone being directed to be tested for drugs and alcohol after a workplace accident. Second, Ensystex has no policy for a drug or alcohol screening upon an accident. Third, it was strange because Plaintiff had never failed a drug test (annual or "random"). Finally, Plaintiff does not use drugs and drinks extremely infrequently, there was no evidence that Plaintiff was behaving is such a way to suggest he was impaired by drugs or alcohol.

41. Plaintiff complied but Mr. Kosko would not permit Plaintiff to return to work until the results of the urinalysis were returned.

42. After four days, Mr. Kosko informed Plaintiff that the urinalysis had been returned (it was, of course, negative for drugs or alcohol) and that Plaintiff could return to work the next day.

43. On May 22, 2020, Plaintiff returned to work and Mr. Kosko immediately terminated his employment.

44. Plaintiff asked whether he was actually being terminated for such a minor forklift accident. Mr. Kosko replied that it was not because of the accident, it was his choice.

45. Plaintiff appealed the termination decision to Ray Nimocks. Mr. Nimocks did not conduct a separate investigation and instead told Plaintiff that he deferred to Mr. Kosko's decision.

46. After Plaintiff was terminated, he filed a charge of discrimination with the EEOC. Perhaps sensing vulnerability in its pretextual rationale, in its position statement submitted to the EEOC, Defendant offered additional reasons to allegedly justify terminating Plaintiff. Specifically it stated:

    a. Plaintiff had a "troubled tenure" with Ensystex;

    b. He was repeatedly reprimanded for excessive absenteeism, abuse of break periods, unnecessary squabbling with coworkers, disrespect and insubordination when asked to work in heat or cold, other unspecified "unprofessional behavior," falling asleep at work, and sandbagging;

    c. Plaintiff was "by far" the weakest member of his team;

    d. The forklift accident was costly (Defendant cited that Plaintiff caused $2,600 in damage) and put employees' safety at risk;

    e. Team morale would be improved by his termination;

    f. Plaintiff's services were redundant; and

    g. There was no longer a need for a fifth member at the Bait Shop and that Defendant has not in fact hired someone to fill his position.

47. All of these purported reasons for termination are pretextual.

48. Plaintiff did not have troubled tenure at Ensystex. Rather, because of his superior performance, he received raises and bonuses whenever possible. Indeed, Plaintiff's performance or any of the alleged behavioral issues listed in Defendant's position statement are demonstrably false and were never once formally addressed.

49. Plaintiff was not the weakest member of his team. On the contrary, Plaintiff was the only employee able to be the head driver and was even assigned to train new employees.

50. Categorizing the forklift accident as costly and putting employees' safety at risk also highlights the pretextual nature of Ensystex's positions.

51. Regarding the cost of the repair, Defendant misrepresents the facts to the EEOC. It stated that Plaintiff was responsible for $2,600 in damages to the building. However, the portion of the building damaged in the accident was previously damaged and in desperate need of repair.

52. Furthermore, at the time of the accident, there were no employees closer than 75 feet of Plaintiff. Little to no safety risk to employees existed.

53. Moreover, Defendant's decision to terminate Plaintiff for the accident flies in the face of how it has treated other employees who were involved in forklift accidents in the past.

54. Multiple Caucasian employees have been in forklift accidents without any discipline, let alone termination. Moreover, none of these employees were directed to submit to a urinalysis and held out of work in the results were returned.

**9**/12

55. Specifically, Matt Edwards (Caucasian) crashed the forklift multiple times during his tenure. Mr. Edwards even seemed to take pride in pointing out to other employees all the things he hit with the forklift.

56. Additionally, Brent Capage (Caucasian) had a forklift accident that was severe enough that it resulted in an injury necessitating a light duty for some time thereafter. Brent Capage was neither disciplined nor terminated for his accident.

### F. <u>Defendant Has a History of Discrimination</u>

57. Defendant has a history of treating African American employees differently that its Caucasian employees.

58. Despite approximately 40% of its workforce being made up of African Americans, not a single position with supervisory authority is held by an African American. This compelling fact was true for the entirety of Plaintiff's tenure.

59. Indeed, African American employees are relegated to the labor-intensive jobs, and when a supervisory position opens up, if an internal Caucasian candidate is not available, much like it did with Mr. Kosko, Defendant will hire an external candidate rather than promote an African American employee from within.

60. In fact, at the Corporate Office, Defendant employs only a single African American employee, Lisa Smith, who serves as a secretary.

61. Defendant's discriminatory nature and practice of stereotyping African Americans were on full display through its annal parties for its sales representatives and members of the corporate office. One year, all administrative staff were welcomed to bring a "plus one." Ms. Smiley — an employee of the Esystex corporate office at the time — brought her husband, Plaintiff. The next year however, all administrative staff were still allowed to bring a plus one, <u>except for the specific exception for those who brought African American "plus ones" from the prior year</u>.

**10**/12

Case 5:21-cv-00253-FL   Document 1   Filed 06/10/21   Page 10 of 12

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Race Discrimination in Violation of Title VII

62. Plaintiff incorporates the foregoing paragraphs by reference herein.

63. As an African American, Mr. Smiley is a member of a protected class.

64. During his employment, Mr. Smiley was subjected to race discrimination including being subjected to termination.

65. Mr. Smiley was treated less favorably than his Caucasian counterparts.

66. The adverse action taken against Mr. Smiley was motivated by his race.

67. Defendant's actions as described herein were willful and wanton and done with reckless disregard for Mr. Smiley's protected rights.

68. As a result of Defendant's discriminatory conduct, Mr. Smiley has suffered damages.

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all questions of fact raised by this Complaint.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court enter a judgment in his favor and against the Defendant(s) and award the following:

(a) Injunctive, declaratory, and prospective relief as allowed by law;

(b) Damages in such an amount as shall be proven at trial for back-pay and damages including lost benefits, wages, promotions, tenure, seniority, and other employment opportunities.

(c) An order to reinstate Plaintiff, or in the alternative, front pay and benefits in an appropriate amount;

(d) Compensatory damages, including emotional distress as allowed by law

(e) Punitive damages;

(f) Attorney's fees and costs as provided for by law;

(g) Pre- and post-judgment interest as provided for by law; and

(h) Such other relief as the Court deems just on proper.

**Williams & Ray, PLLC:**

_____
Brycen G. Williams
State Bar No. 50253
  Williams & Ray, PLLC
  555 Fayetteville St., Suite 201
  Raleigh, NC 27601
  Phone:  (888) 315-3841
  Fax:     (303) 502.5821
  Email:   bw@williamsray.com
  *Attorneys for Plaintiff*

Plaintiff's Address
Jeffrey A. Smiley
7268 Elliot Bridge Road
Slocomb, NC 28390