IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:21-CV-253-FL

| | | |
|---|---|---|
| JEFFREY SMILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| ENSYSTEX II, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE 9). The issues raised have been briefed fully, and in this posture, are ripe for ruling. For the following reasons, defendant's motion is denied.

**STATEMENT OF THE CASE**

Plaintiff commenced this employment discrimination action against his former employer June 10, 2021, alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., ("Title VII"). Plaintiff seeks compensatory and punitive damages, declaratory and injunctive relief, attorneys' fees, and costs.

Defendant filed the instant motion to dismiss with reliance upon a United States Equal Employment Opportunity Commission ("EEOC") dismissal and notice of rights, as well as correspondence from defendant to the EEOC with exhibits. Scheduling activities in the case have been stayed pending decision on defendant's motion.

## STATEMENT OF FACTS

The facts alleged in plaintiff's complaint may be summarized as follows. Defendant is a manufacturer and supplier of pest control products. (Compl. (DE 1) ¶ 6). Plaintiff is "an African American male" whom defendant hired in April of 2010 as a "relief driver" and production material handler within its "Bait Shop." (Id. ¶¶ 14-15). As a relief driver, plaintiff undertook the responsibilities of the "head driver," namely transporting product and supplies to and from defendant's various facilities, in the head driver's absence. (Id. ¶¶ 13, 15).

Plaintiff allegedly "thrived in his role." (Id. ¶ 18). He received quarterly and annual bonuses, as well as "a raise in his hourly rate of pay on every occasion that [d]efendant was providing raises to its hourly workers." (Id.). Defendant further designated plaintiff as a trainer for new employees, including in forklift operations. (Id. ¶ 15). Plaintiff did not receive any formal reprimands while employed by defendant, nor did he have an accident while driving at work, excepting the single forklift incident that allegedly gave rise to his termination. (Id. ¶ 19).

Plaintiff initially reported to defendant's co-owner, Ray Nimocks, a "Caucasian male," and subsequently reported to defendant's other co-owner, Tyler Nimocks. (Id. ¶ 16). In the end of 2016, Tyler Nimocks stepped away as supervisor, and plaintiff expressed to Ray Nimocks his desire to be considered for the role. (Id. ¶¶ 22, 23). Ray Nimocks agreed to consider plaintiff, but ultimately never interviewed him. (Id. ¶¶ 23-24).

During plaintiff's tenure, "[d]espite approximately 40% of its workforce being made up of African Americans, not a single position with supervisory authority [was] held by an African American." (Id. ¶ 58). Instead, "African American employees [were] relegated to labor-intensive jobs, and when a supervisory position open[ed] up, if an internal Caucasian candidate [was] not

available," defendant allegedly would "hire an external candidate rather than promote an African American employee from within."  (Id. ¶ 59).

Consistent with that alleged practice, and without "formally posting" the position, defendant hired Sam Kosko ("Kosko"), a "Caucasian," instead of plaintiff for the role of supervisor at the Bait Shop.  (Id. ¶ 24).  Kosko did not have "experience in the pest control industry," nor did he have experience "working in a facility that mixed chemicals to produce products."  (Id. ¶ 25). "In fact, [p]laintiff was called upon to train" Kosko, where plaintiff by that time had approximately six years of experience with defendant.  (Id.).

Within the first few months of being hired, Kosko observed plaintiff "taking brief leave to attend his doctor's appointments." (Id. ¶ 27).  Defendant previously had granted plaintiff "intermittent leave under the Family Medical Leave Act ('FMLA')" so plaintiff could, on a biweekly basis, receive insulin and testosterone shots to manage his type 2 diabetes.  (Id. ¶ 21). Defendant previously had granted plaintiff a religious accommodation permitting him not to work on Saturday, which plaintiff observes as the day of Sabbath.  (Id. ¶ 20).  Prior to Kosko's hiring, plaintiff's documentation to receive these accommodations was not scrutinized, nor did plaintiff face demands or questions unprompted by defendant's human resources department in relation to them.  (Id. ¶ 27).

Kosko, however, demanded that plaintiff "submit additional paperwork to maintain his FMLA leave."  (Id.).  Plaintiff complied, and human resources maintained his accommodation. (Id. ¶ 28).  In 2018, again unprompted by human resources, Kosko demanded for a second time that plaintiff submit paperwork to maintain his FMLA leave.  (Id. ¶ 29).  After inquiring as to the purpose for such redundant documentation, plaintiff again complied.  (Id.).  The following year, Kosko demanded that plaintiff begin working on Saturdays.  (Id. ¶ 30).  Plaintiff objected, citing

3

to his religious accommodation, but Kosko did not remit. (Id.). Plaintiff appealed to Ray Nimocks, who overruled Kosko and permitted plaintiff to maintain his religious accommodation. (Id. ¶ 31).

Kosko additionally instituted a program requiring all drivers, including plaintiff as the relief driver, to take random drug tests. (Id. ¶ 34). Over the course of four years, Kosko subjected plaintiff to at least three random drug tests. (Id. ¶ 35). Each time, Kosko directed him to submit to the screening immediately. (Id.). Conversely, during that same period, Kosko subjected the "Caucasian" head driver to only one drug test, and he was permitted to schedule the test at his convenience. (Id. ¶¶ 17, 35).

In December 2019, defendant's head driver moved into a supervisory position, leaving the role of head driver open. (Id. ¶ 32). As the only other driver in the company, plaintiff filled the vacancy. (Id.). Kosko, however, refused to formally change plaintiff's title to head driver or acknowledge him as same. (Id. ¶ 33). Plaintiff did not receive a pay raise and was paid considerably less than the former head driver. (Id.). Moreover, while defendant provided the former head driver with a company email address and cell phone, and allowed him full autonomy to plan deliveries, defendant provided plaintiff with neither and Kosko dictated his schedule. (Id. ¶¶ 17, 33).

On May 12, 2020, "while driving a forklift with a load of pallets, [p]laintiff inadvertently clipped a piece of loose metal hanging off the Bait Shop building causing an accident." (Id. ¶ 36). It was plaintiff's first work-related accident in his ten years of employment with defendant, and "the portion of the building damaged in the accident was previously damaged and in desperate need of repair." (Id. ¶¶ 37, 51). No employee was harmed. (Id. ¶ 52). In fact, no employee was within 75 feet of plaintiff at the time of the accident. (Id.). Plaintiff reported the matter to Kosko, who instructed plaintiff immediately to leave work and submit to drug and alcohol tests. (Id. ¶¶

4

38, 39). Plaintiff had never before observed defendant require an employee to submit to such testing following a workplace accident, nor does defendant company have an official policy requiring it. (Id. ¶ 40). Plaintiff does not use drugs, drinks alcohol infrequently, and had never failed an annual or random drug test. (Id.). There was no evidence he was under the influence at the time of the accident. (Id.).

Plaintiff was not permitted to return to work until his urinalysis test came back negative for drugs and alcohol four days later, on May 21, 2022. (Id. ¶¶ 41, 42). Upon his return the following day, Kosko terminated him. (Id. ¶ 43). When plaintiff inquired whether he was being terminated for the forklift incident, Kosko replied that it was not because of the accident, but rather "was his choice." (Id. ¶ 44). Plaintiff appealed the termination to Ray Nimocks, who deferred to Kosko's decision. (Id. ¶ 45).

During plaintiff's tenure, multiple white employees allegedly "have been in forklift accidents without any discipline, let alone termination." (Id. ¶ 54). Additionally, none were directed to submit to a urinalysis and held out of work until the results were returned. (Id.). Matt Edwards, a white male, crashed a forklift multiple times while employed with defendant, and took pride in pointing out to other employees all the things he had hit with the forklift. (Id. ¶ 55). Brent Capage, another white male, had a forklift accident resulting in injury severe enough that it necessitated his being placed on "light duty" with defendant for some time thereafter. (Id. ¶ 56). Neither employee was terminated. (Id. ¶¶ 54, 56).

Prior to plaintiff's termination, his wife, who formerly worked at defendant's corporate office, invited plaintiff to defendant's annual party for sales representatives and members of the corporate office. (Id. ¶ 61). That year, all administrative staff were permitted to invite a "plus one." (Id.). The following year, all administrative staff were again permitted to invite a guest,

5

"except for the specific exception for those who brought African American 'plus ones' from the prior year." (Id.). As of the time of filing the instant complaint, defendant's corporate office employed "a single African American employee," who serves as a secretary. (Id. ¶ 60).

After defendant terminated plaintiff, plaintiff filed a charge with the EEOC. (Id. ¶ 46). In its response, defendant asserted that plaintiff: 1) had a "troubled tenure" with defendant; 2) was "repeatedly reprimanded for excessive absenteeism, abuse of break periods, unnecessary squabbling with coworkers, disrespect and insubordination when asked to work in heat or cold, other unspecified 'unprofessional behavior,' falling asleep at work, and sandbagging"; 3) was "'by far' the weakest member of the team"; 4) caused the "costly" forklift accident, resulting in $2,600 in damage, that placed other "employees' safety at risk"; 5) had a negative impact on "team morale"; and 6) performed "redundant" services for which defendant did not need to hire a replacement. (Id.).

**COURT'S DISCUSSION**

A.  Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).[1] "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further

---

[1]  Internal citations and quotation marks are omitted from all citations unless otherwise specified.

factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

B.  Analysis

Plaintiff asserts defendant terminated him on the basis of his race in violation of Title VII.

> Ultimately, a plaintiff bringing an employment discrimination claim under Title VII . . . must provide supporting evidence through one of two methods: (1) direct or circumstantial evidence that discrimination motivated the employer's adverse employment decision, or (2) the McDonnell Douglas pretext framework that requires the plaintiff to show that the employer's stated permissible reason for taking an adverse employment action is actually a pretext for discrimination.

Bing v. Brivo Sys., LLC, 959 F.3d 605, 617 n.8 (4th Cir. 2020). "To prove a prima facie case of discrimination under the McDonnell Douglas framework, [a plaintiff] must establish (1) membership in a protected class, (2) discharge, (3) while otherwise fulfilling Defendants' legitimate expectations at the time of his discharge, and (4) under circumstances that raise a reasonable inference of unlawful discrimination." Id.

However, "[i]n the context of a Title VII case, an employment discrimination plaintiff need not plead a prima facie case of discrimination to survive a motion to dismiss." Id. at 617. "Instead, a Title VII plaintiff is required to allege facts to satisfy the elements of a cause of action created by that statute." Id. Title VII prohibits an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Thus, the relevant inquiry here is whether plaintiff pleaded facts that plausibly support the inference that he was terminated because of his race. Bing, 959 F.3d at 617.

Plaintiff's allegations of racial motivation cannot be "conclusory" such that the court "would have to speculate to fill in the gaps as to [defendant's] motivation" in terminating him. Id. at 618. "The mere fact that a certain action is potentially consistent with discrimination does not

7

alone support a reasonable inference that the action was motivated by bias." Id. For instance, a black plaintiff's allegation that two non-black candidates were hired over her is insufficient, without more, to establish that she was not selected because of her race. McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin., 780 F.3d 582, 585-586 (4th Cir. 2015). On such facts, the court "can only speculate that the persons hired were not better qualified, or did not perform better during their interviews, or were not better suited based on experience and personality for the positions." Id. at 586.

The court must "consider the plausibility of inferring discrimination based on [plaintiff's] allegations in light of an obvious alternative explanation for the conduct." Woods v. City of Greensboro, 855 F.3d 639, 649 (4th Cir. 2017). However, "[t]o survive a motion to dismiss, a plaintiff need not demonstrate that her right to relief is probable or that alternative explanations are less likely[.]" Houck v. Substitute Tr. Servs., Inc., 791 F.3d 473, 484 (4th Cir. 2015). In considering the plausibility of alternative explanations, the question is not whether there are more likely explanations than discrimination, but rather whether defendant's proffered reason "is so obviously an irrefutably sound and unambiguously nondiscriminatory and non-pretextual explanation that it renders [plaintiff's] claim of pretext implausible." Woods, 855 F.3d at 649; see id. at 652 ("[D]iscrimination claims are particularly vulnerable to premature dismissal because civil rights plaintiffs often plead facts that are consistent with both legal and illegal behavior, and civil rights cases are more likely to suffer from information-asymmetry, pre-discovery.").

Plaintiff here has established a plausible basis to infer defendant terminated him because of his race. Plaintiff has alleged that white employees crashed forklifts in the past, including one whose resulting injuries were serious enough to require accommodation by defendant, and another who shared with other employees his pride in the number of objects he had crashed into on a

8

forklift. (Compl. ¶¶ 54-56). Those employees allegedly were not terminated, nor even reprimanded. (Id. ¶ 54). Plaintiff, by comparison, was forced immediately to leave work, undergo urinalysis testing, and subsequently was terminated following his only accident in ten years of employment. (Id. ¶¶ 38-40, 43).

Plaintiff additionally alleges Kosko, in his role as plaintiff's supervisor: 1) implemented and disparately applied "random" drug tests such that plaintiff was subjected to them at least three times more than the white head driver, (id. ¶¶ 34-35); 2) required plaintiff to undergo such drug tests on different terms, where plaintiff was required immediately to submit to them while the head driver could schedule tests at his own convenience, (id. ¶ 35); 3) refused to formally promote plaintiff when he assumed the duties of head driver, (id. ¶ 33); and 4) denied plaintiff the privileges of the position enjoyed by the former head driver including a work email address, cellphone, and control over his delivery schedule, (id. ¶¶ 17, 33).

Finally, plaintiff alleges defendant engaged in discriminatory hiring practices whereby defendant "will hire an external candidate rather than promote an African American employee from within" with more experience. (Id. ¶ 59). Plaintiff alleges he personally experienced that bias, and further, that the composition of defendant's supervisors reflected defendant's discriminatory practice. (Id. ¶¶ 58-59).

Namely, plaintiff alleges "[d]espite approximately 40% of its workforce being made up of African Americans, not a single position with supervisory authority is held by an African American." (Id. ¶ 58). Plaintiff additionally alleges that in one instance defendant prohibited employees from bringing "African American 'plus ones'" to a company party while permitting other guests. (Id. ¶ 61). These allegations of discriminatory practices necessarily inform this court's "common sense" analysis of whether plaintiff's claim that he was terminated because of

9

his race is plausible. Iqbal, 556 U.S. at 679; see Woods, 855 F.3d at 648-49 ("Court[s] may infer discriminatory intent from evidence of a general pattern of racial discrimination in the practices of a defendant.").

Considered together, plaintiff's allegations support a plausible inference that defendant was motivated by racial bias in terminating plaintiff. Still, the court must additionally consider defendant's explanation for terminating him on the possibility that such explanation renders plaintiff's claim of discrimination implausible. See Woods, 855 F.3d at 649.

Defendant asserts plaintiff: 1) had a "troubled tenure" with defendant; 2) was repeatedly reprimanded for excessive absenteeism, abuse of break periods, unnecessary squabbling with coworkers, disrespect and insubordination when asked to work in heat or cold, other unspecified "unprofessional behavior," and sandbagging; 3) was "by far" the weakest member of the team; 4) caused a costly forklift accident that placed other employees' safety at risk; 5) had a negative impact on team morale; and 6) performed redundant services, and indeed defendant had not hired anyone to fill his position following his termination. (Def. Mem. (DE 10) at 3, 5-6; see Compl. ¶ 46).

Viewed in the light most favorable to plaintiff, however, plaintiff's complaint contains allegations of fact which undermine defendant's explanations. In particular, 1) defendant awarded plaintiff raises and bonuses in every instance they were provided; 2) defendant never addressed plaintiff's alleged deficiencies formally; 3) plaintiff was the only employee able to assume the role of head driver when that role became available; 4) plaintiff was assigned to train other employees; and 5) defendant did not reprimand other named, white employees when they were similarly involved in forklift accidents. (Compl. ¶¶ 48-56). Thus, having considered defendant's alternative

explanations, plaintiff's allegations remain more than sufficient to "nudge[] [plaintiff's] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

Defendant's arguments to the contrary are unavailing. Defendant primarily relies upon Bing, asserting that it stands for the principle that where a plaintiff alleges non-racial reasons for his discharge, without additionally alleging facts refuting them, the complaint must be dismissed. As already noted, plaintiff does allege facts plausibly refuting each of the non-racial reasons defendant offered for his termination. (Compl. ¶¶ 48-56). More significantly, however, defendant mischaracterizes Bing. Bing reiterates the well-established principle that a plaintiff on motion to dismiss cannot rely upon conclusory allegations to support a claim of racism. Bing, 959 F.3d 605, 617-18 (finding McCleary-Evans, 780 F.3d at 583-86 "instructive"). Here, plaintiff "catalogs numerous factual allegations beyond conclusory recitals of law." Woods, 855 F.3d at 652.

Bing does not state that a plaintiff affirmatively must refute every alternative explanation offered by defendant for the adverse employment action on defendant's motion to dismiss. See e.g., Bing, 959 F.3d at 617-619. In addition, the United States Court of Appeals for the Fourth Circuit previously has held that, while the court must "consider the plausibility of inferring discrimination based on [plaintiff's] allegations in light of an obvious alternative explanation for the conduct," Woods, 855 F.3d at 649, "[t]o survive a motion to dismiss, a plaintiff need not demonstrate that her right to relief is probable or that alternative explanations are less likely[.]" Houck, 791 F.3d at 484. Rather, on motion to dismiss the question is whether defendant's proffered reasons "[are] so obviously an irrefutably sound and unambiguously nondiscriminatory and non-pretextual explanation[s] that [they] render[] [plaintiff's] claim of pretext implausible." Woods, 855 F.3d at 649. Here, they are not.

Defendant additionally argues plaintiff's complaint should be dismissed as it fails to establish a prima facie case under the McDonnell Douglas framework. (Def. Reply (DE 12) at 2). As already noted, however, "an employment discrimination plaintiff need not plead a prima facie case of discrimination to survive a motion to dismiss." Bing, 959 F.3d at 617. Relatedly, defendant asserts plaintiff's "allegations about comparators are deficient because they fail to show that they were actually similarly situated to him." (Def. Mem. (DE 10) at 6). However, "[t]he similarly situated analysis typically occurs in the context of establishing a prima facie case of discrimination, not at the 12(b)(6) stage." Woods, 855 F.3d at 651. [W]hether the comparators' features are sufficiently similar to constitute appropriate comparisons generally should not be made [upon a motion to dismiss]." Thus, defendant's arguments are premature.

Finally, defendant refers to the fact that plaintiff repeatedly had engaged in protected activity pursuant to his health and religious accommodations without consequence, asserting "[i]t is illogical for an employer to suddenly decide to fire an employee because of his (well known) race 10 years into his tenure, especially when other opportunities for discrimination (or, more specifically, retaliation) existed and were not taken." (Def. Mem. (DE 10) at 7). Defendant makes mention of the fact that Ray Nimocks, who had previously contested adverse employment actions he perceived to be discriminatory, supported plaintiff's discharge. As the Fourth Circuit has observed, however, "even though the defendant may not discriminate consistently against every woman or minority under all conditions," it is not implausible to believe defendant has, on other occasions, acted upon an illicit bias. Woods, 855 F.3d at 651 (emphasis omitted). Here, for the reasons aforementioned, it is plausible to believe that plaintiff's termination was racially motivated, even where his treatment in other regards was not.

12

Case 5:21-cv-00253-FL   Document 13   Filed 06/07/22   Page 12 of 13

In sum, plaintiff's complaint states a plausible claim for relief that "permit[s] the court to infer more than the mere possibility of misconduct" based upon "its judicial experience and common sense." <u>Ashcroft</u>, 556 U.S. at 679.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 9) is DENIED. Where the parties' scheduling activities previously were stayed pursuant to this court's order entered September 23, 2021, the court now LIFTS that stay. Pursuant to Federal Rule of Civil Procedure 12(a)(4)(A), a responsive pleading must be served within 14 days of date of entry of this order.

SO ORDERED, this the 7th day of June, 2022.

_____
LOUISE W. FLANAGAN
United States District Judge